**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SEALED

**Holding a Criminal Term
Grand Jury Sworn in on May 2, 2008**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** CR - 08 - 271 |
| | : | |
| | : | **GRAND JURY ORIGINAL** |
| | : | |
| **v.** | : | **VIOLATIONS:** |
| | : | |
| | : | **18 U.S.C. § 371 (Conspiracy);** |
| **EDDIE RAY KAHN,** | : | **18 U.S.C. § 1341 (Mail Fraud);** |
| **STEPHEN C. HUNTER,** | : | **18 U.S.C. § 2 (Aiding and Abetting** |
| **DANNY TRUE,** | : | **and Causing an Act to be done)** |
| **     a/k/a DARBY** | : | |
| **JERRY R. WILLIAMSON,** | : | |
| **     a/k/a JAY ARR, and** | : | |
| **ALLAN J. TANGUAY,** | : | |
| **     a/k/a ARNOLD** | : | SEP 03 2008 |
| | : | |
| **          Defendants** | : | |

**INDICTMENT**

The Grand Jury charges that:

**COUNT ONE - CONSPIRACY**

KENNEDY, JR. J. HHK

Introduction

At all times material to this Indictment

1.     The Internal Revenue Service ("IRS") is an agency of the United States

Department of the Treasury (hereinafter, "the U.S. Treasury"), which is headquartered in

Washington, DC.  The IRS has responsibility for the ascertainment, computation, assessment,

and collection of taxes, including income taxes.   The Treasury Inspector General for Tax

1

Administration (hereinafter, "TIGTA") is an independent investigative office within the U.S. Treasury.

2.      Defendant EDDIE RAY KAHN was the founder and leader of American Rights Litigators and its successor, Guiding Light of God Ministries (collectively hereinafter, "ARL").

3.      Defendants STEPHEN C. HUNTER, DANNY TRUE, also known as DARBY, and JERRY R. WILLIAMSON, also known as JAY ARR, worked for ARL, generally as members of its so-called Research Department. Defendant ALLAN J. TANGUAY, also known as ARNOLD, worked for ARL as a manager and writer. Defendants KAHN, HUNTER, TRUE, WILLIAMSON, and TANGUAY (hereinafter generally referred to as "the defendants") resided in various parts of Florida.

4.      ARL was a business that promoted and sold tax defiance schemes that interfered with the functioning of the IRS and other taxing authorities. These tax defiance schemes were based on deliberate misrepresentations of the legal foundation of the tax system. The tax defiance schemes promoted and sold by ARL consisted mainly of false and fictitious documents mass-produced at ARL and mailed to government offices across the United States, especially to the IRS and the U.S. Treasury in Washington, DC. ARL was formed in 1996 as a purported "business trust" and conducted business from an office located in Mount Plymouth, Florida. At various times, more than twenty employees were listed under false names (such as "Clark Kent") on the ARL payroll in order to conceal the amount of the employees' pay from the IRS. The wages of workers at ARL, including the defendants, were paid in cash. In 2003, after the IRS began seizing unpaid taxes from ARL bank accounts, ARL moved to offices located in Mount Dora, Florida, and began operating as Guiding Light of God Ministries, a purported "corporation

2

sole."

5.      Defendants HUNTER, TRUE, WILLIAMSON and TANGUAY worked with defendant KAHN to develop new tax defiance schemes to be sold by ARL.   With defendant KAHN, they sold the tax defiance schemes to ARL customers.

6.      Defendant KAHN personally promoted the tax defiance schemes at seminars he held across the United States.   At the seminars, defendant KAHN gave lectures such as "Having Fun With the Tax Man" that purported to teach people how to "defeat" IRS personnel during meetings about their taxes.   Defendant KAHN promoted fraudulent misrepresentations of the law, including claims that the IRS is not an agency of the United States government.   Defendant KAHN further promoted tax defiance schemes during regularly-scheduled conference telephone calls, by the distribution of videotapes, and through statements published in a newsletter called "Tax Truth News Featuring Eddie Kahn," and in a book he assembled entitled, No Enforcement Statutes / IRS Regulations Applicable for Individual Income Tax.

7.      Between 1996 and 2004, ARL enrolled more than 4,000 customers known as "members" or "patrons."   These customers were located in all fifty states, the District of Columbia and several foreign countries.   Individual customers paid an annual fee of $150 to "belong" to ARL, plus specific additional fees for the various schemes sold by ARL.   For example, ARL generally charged customers $50 for each piece of obstructive and frivolous correspondence that it sent to the IRS on the customer's behalf.   The defendants and others created dozens of different types of "boilerplate" letters to be sent to the IRS, the U.S. Treasury and other government and non-government recipients.   The defendants mass-produced this obstructive correspondence using a sophisticated computerized system.   Generally, customers

3

were required to pay ARL before ARL would generate and mail the harassing and frivolous correspondence to the recipients on behalf of the customers.

8.     The many different types of "boilerplate" letters sold by ARL included false declarations that IRS Revenue Officers are without authority to collect taxes, false announcements that the customer had "expatriated" from the United States and was therefore no longer subject to taxation, and letters falsely telling banks that it is against the law for the IRS to levy funds from customer accounts for overdue taxes. ARL also sold so-called "corporations sole" to customers for $1300 each. "Corporations sole" were fake religious entities set up by ARL and registered as corporations in the State of Nevada that were to be used by customers to hide assets and income from the IRS and other creditors. ARL also sold documents that falsely complained to TIGTA that IRS workers had committed crimes such as extortion and mail fraud against ARL customers.

9.     Starting in 2001, defendants KAHN, TRUE, HUNTER, WILLIAMSON, and TANGUAY began to personally participate in an ARL scheme known as "the UCC Process" or "UCC paperwork," and to sell the scheme to customers. The scheme involved the preparation and filing of frivolous Uniform Commercial Code (hereinafter, "UCC") documents with state agencies followed by the preparation and mailing to creditors of fictitious financial instruments that falsely purported to draw upon the U.S. Treasury to pay taxes and other debts. The defendants encouraged customers to send these documents to the U.S. Treasury in Washington, DC, and to various IRS offices, among other places, in purported payment of their tax debts.

10.     On December 8, 2003, the United States Department of Justice filed a motion with the District Court in Ocala, Florida requesting that the court restrain ARL and defendant

KAHN and others from promoting abusive tax schemes, including those described above.  On December 29, 2003, the court issued a Preliminary Injunction that prohibited ARL, and defendant KAHN and others from, among other things, preparing or assisting in the preparation of correspondence to the IRS on behalf of any other person or entity; preparing or assisting in the preparation of UCC forms; selling "corporations sole;" selling any purported draft check, bond, or other similar instrument to be used by the purchaser to pay federal taxes; and preparing or assisting in the preparation of complaints to TIGTA.   In defiance of the order of the court, defendants KAHN, TRUE, HUNTER, WILLIAMSON, and TANGUAY continued to engage in the business of promoting and marketing such abusive tax schemes in January and February of 2004.  ARL only stopped operating shortly after February 13, 2004, when its files were seized during the execution of a federal search warrant at its offices.

THE CONSPIRACY

11.    Beginning in and around 2000 and continuing until in and around March 2004, in the District of Columbia, and elsewhere,

EDDIE RAY KAHN,<br>
STEPHEN C. HUNTER,<br>
DANNY TRUE,<br>
JERRY R. WILLIAMSON, and<br>
ALLAN J. TANGUAY

the defendants herein, did unlawfully, voluntarily, intentionally and knowingly conspire, combine, confederate, and agree together and with each other and with other individuals both known and unknown to the Grand Jury (hereinafter sometimes referred to as "co-schemers"):

A.    to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful Government functions of the Internal Revenue Service of the Treasury

Department in the ascertainment, computation, assessment, and collection of the revenue: to wit, income taxes; and

      B.     to commit offenses against the United States, that is: to knowingly and willfully devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and to exchange, give away, distribute, supply, furnish and procure for unlawful use, any counterfeit or spurious obligation, security, or other article, and anything represented to be and intimated and held out to be such counterfeit or spurious article and for the purpose of executing and attempting to execute said scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and to exchange, give away, distribute, supply, furnish, and procure for unlawful use, any counterfeit or spurious obligation, security, or other article, defendants placed and caused to be placed in a post office and authorized depository for mail matter, to be sent and delivered by the United States Postal Service, and deposited and caused to be deposited for delivery by a private or commercial interstate carrier, from or to the District of Columbia in violation of Title 18, United States Code, Section 1341 (Mail Fraud).

Goals of the Conspiracy

      12.     It was a goal of the conspiracy to make money by selling tax defiance schemes to customers who paid ARL to thwart the efforts of the IRS to assess and collect federal taxes owed by ARL customers.

      13.     It was further a goal of the conspiracy to use tax defiance schemes to thwart the efforts of the IRS to assess and collect federal taxes owed by the defendants themselves.

6

## Manner and Means of the Conspiracy

14.     It was a part of the conspiracy that defendants KAHN, TRUE, HUNTER, WILLIAMSON, and TANGUAY would and did attempt, through deceit, craft, trickery, and dishonest means, to manufacture and cause to be manufactured worthless and fictitious financial instruments and to present and cause to be presented to the IRS and the U.S. Treasury such worthless and fictitious financial instruments in purported payment of federal income tax obligations.

15.     This so-called "UCC Process" or "UCC paperwork" organized by defendants KAHN, TRUE, HUNTER, WILLIAMSON and TANGUAY involved the manufacture, use, and sale of fictitious financial instruments.   These worthless instruments were variously known as "bonds," "Bills of Exchange," "charge backs," "drafts," and other names (collectively, hereinafter "BOEs") and were fabricated to appear as though they were drawn on the U.S. Treasury.

16.     The first step in the so-called "UCC Process" was for defendants KAHN, TRUE, HUNTER, WILLIAMSON and TANGUAY to cause the preparation and sale of purported "UCC Financing Statements" to customers who were instructed to file such statements along with their birth certificates and other documents with various state Secretaries of State.

17.     The second step in this process was for defendants KAHN, TRUE, HUNTER, WILLIAMSON and TANGUAY to cause the manufacture of false instructions regarding a so-called "private account" supposedly held by the customer at the U.S. Treasury in Washington, DC.  Defendants then had customers send the false instructions and other documents to the U.S. Treasury in Washington, DC. The defendants falsely claimed that such filings would allow the

7

customers to draw upon their so-called "private accounts" at the U.S. Treasury by means of BOEs.

18.    The third step in this process was for defendants KAHN, TRUE, HUNTER, WILLIAMSON and TANGUAY to cause the manufacture of BOEs, along with related documents contrived to make the worthless BOEs appear legitimate, which the defendants then sold to ARL customers.  The defendants instructed the customers to mail the BOE packages to the IRS and the U.S. Treasury in purported payment of tax debts.  The packages sold by the defendants included envelopes pre-addressed to the IRS and the U.S. Treasury in Washington, DC.

19.    It was further part of the scheme that defendants KAHN, TRUE, HUNTER, and TANGUAY also manufactured BOEs and document packages such as those described above for themselves, and then personally submitted the BOEs and related documents to the IRS and the U.S. Treasury in purported payment of their own federal tax debts.

20.    It was further part of the scheme that, upon rejection of the BOEs by the IRS and the U.S. Treasury, defendants KAHN, TRUE, HUNTER, WILLIAMSON and TANGUAY caused the manufacture and sale to customers of letters to the IRS and TIGTA in Washington, DC alleging that IRS employees had committed criminal offenses by not accepting the BOEs as payment.

21.    It was further part of the conspiracy that defendants KAHN, TRUE, HUNTER, WILLIAMSON, and TANGUAY would and did attempt, through deceit, craft, trickery, and dishonest means, to manufacture and cause to be manufactured and present and cause to be presented to TIGTA false and harassing complaints against IRS employees.  The complaints

8

falsely alleged criminal acts on the part of the employees and sought the termination of those employees.

22.     It was further part of the conspiracy that, in direct violation of the December 29, 2003 order of the United States District Court forbidding such conduct, defendants KAHN, TRUE, HUNTER, WILLIAMSON, and TANGUAY continued to prepare and cause to be prepared fraudulent and obstructive correspondence to the IRS on behalf of ARL customers.

23.     It was further part of the conspiracy that defendants KAHN, TRUE, HUNTER, WILLIAMSON, and TANGUAY and other individuals known and unknown to the Grand Jury would and did perform acts and make statements to hide and conceal and cause to be hidden and concealed the purpose of the conspiracy and the acts committed in furtherance thereof.

Overt Acts

24.     In furtherance of the conspiracy, and to effect the objects thereof, the defendants KAHN, TRUE, HUNTER, WILLIAMSON, and TANGUAY and others known and unknown to the Grand Jury committed and caused to be committed overt acts in the District of Columbia, and elsewhere, including, but not limited to, the following overt acts, among others:

25.     On or about the following dates, false complaints against IRS personnel were sent to TIGTA in Washington, DC:

| Overt Act No. | Date | Complaint About IRS Efforts Regarding |
|---|---|---|
| 25a | February 1, 2000 | Defendant TANGUAY and his wife |
| 25b | August 3, 2000 | ARL Customer P.S. |
| 25c | August 21, 2000 | ARL Customers B.M. & V.M. |

| 25d | October 23, 2000 | Defendant KAHN |
| 25e | February 1, 2001 | ARL Customer J.M. |
| 25f | May 23, 2001 | ARL Customer J.P. |
| 25g | November 14, 2002 | ARL Customer R.O. |
| 25h | March 10, 2003 | ARL Customer S.M. |
| 25i | April 1, 2003 | ARL Customer C.D. |
| 25j | April 15, 2003 | ARL Customer D.E. |
| 25k | May 5, 2003 | ARL Customer C.F. |
| 25l | July 31, 2003 | ARL Customer K.S. |
| 25m | August 1, 2003 | ARL Customer L.C. |
| 25n | August 27, 2003 | ARL Customer R.J. |
| 25o | September 3, 2003 | ARL Customer J.K. |
| 25p | September 15, 2003 | ARL Customer J.W. |

26.     On or about the following dates, one or more of the defendants presented, or caused to be presented, in purported payment of taxes, the following BOEs purportedly drawn on the U.S. Treasury:

| Overt Act No. | Date | Amount | Signed By | Received at |
| --- | --- | --- | --- | --- |
| 26a | 8/14/03 | $4,954,049.40 | ARL Customer R.B. | IRS Missouri |
| 26b | 8/19/03 | $553,787.19 | ARL Customer A.B. | IRS Texas |
| 26c | 8/29/03 | $71,211.91 | Defendant HUNTER | IRS Utah |
| 26d | 8/29/03 | $583,989.51 | ARL Customer R.R. | IRS Missouri |

| 26e | 9/18/03 | $190,962.80 | ARL<br>Customer T.H. | IRS Ohio |
|-----|---------|-------------|---------------------|----------|
| 26f | 11/3/03 | $4,250,829.48 | ARL<br>Customer M.W. | IRS Utah |

27.     On or about April 30, 2001, defendant WILLIAMSON filed a frivolous UCC Financing Statement with the Texas Secretary of State.

28.     On or about June 28, 2001, defendant KAHN traveled to California to meet with a promoter of the "UCC Process."

29.     On or about August 7, 2001, ARL held an in-house seminar on the "UCC Process" at its business office in Mt. Plymouth, Florida, that was attended by ARL employees.

30.     On or about February 26, 2002, defendant KAHN announced at an ARL staff meeting that ARL will be "doing" the "UCC Process" for customers.

31.     In and around May 2002, ARL issued a newsletter offering to prepare "UCC Paperwork" for customers.

32.     On or about June 29, 2002, defendant TRUE sent an email to defendant HUNTER regarding "Bogus Sight Drafts/Bills of Exchange Drawn on the Treasury."

33.     On or about July 31, 2002, an internal email was sent to ARL staff announcing prices to be charged to ARL customers for UCC filing and BOEs.

34.     On or about August 14, 2002, defendant HUNTER sent an email to an ARL customer regarding a UCC filing.

35.     On or about August 15, 2002, defendant HUNTER sent an email to an ARL customer regarding a "Treasury account filing."

36.     On or about August 21, 2002, defendant WILLIAMSON sent a so-called "Letter of Advice" to the Clerk of the United States District Court for the Western District of Texas instructing the Clerk to mail the attached BOE to the U.S. Treasury.

37.     On or about September 10, 2002, defendant KAHN authorized the implementation of an automatic email response to customers seeking information on the "UCC Process."

38.     On or about September 19, 2002, defendant KAHN authorized and caused an email to be sent to ARL customers offering the "UCC-1 filing and response process."

39.     On or about September 30, 2002, defendant HUNTER sent an email to an ARL customer regarding "prepaid Accounts" with the U.S. Treasury.

40.     On or about December 17, 2002, defendant KAHN announced at an ARL staff meeting that ARL would thereafter charge $200 for "UCC filing" and $100 for "Treasury filing."

41.     On or about January 6, 2003, defendant HUNTER sent an email to an ARL customer about BOEs declaring "the process has worked, and is working."

42.     On or about January 20, 2003, defendants TANGUAY and KAHN approved several computer templates for making false complaint letters to be sent from ARL to TIGTA in Washington, DC.

43.     On or about January 27, 2003, defendant TANGUAY emailed a TIGTA complaint form letter to an individual explaining that "this is just a sample letter which actually does not pertain to you but can be revised if I have the details."

44.     In and around February 2003, ARL issued a newsletter telling customers to contact its "Research Department" for information on accessing a U.S. Treasury account to

discharge debts.

45.     On or about February 8, 2003, defendant KAHN sent an email to defendants HUNTER, TRUE, and WILLIAMSON regarding BOEs.

46.     On or about February 10, 2003, defendant KAHN sent an email to defendant HUNTER regarding the ARL automatic email response to customers seeking UCC information.

47.     On or about February 17, 2003, ARL ordered security invoice paper for use in producing BOEs.

48.     On or about February 25, 2003, defendant WILLIAMSON spoke on the telephone with an ARL customer regarding the "UCC code."

49.     On or about March 5, 2003, defendant KAHN approved a computer template for a false complaint letter to be sent from ARL to TIGTA in Washington, DC.

50. On or about April 9, 2003, defendant HUNTER emailed to defendant TANGUAY a document regarding BOEs.

51.     On or about May 9, 2003, defendant HUNTER sent an email thanking an individual who sent him a custom computer font to use for purported bank routing numbers in the manufacture of BOEs.

52.     On or about July 1, 2003, defendant WILLIAMSON sent an email to an ARL customer containing a document purported to be a "Registered Bond for Discharge of Debt."

53.     On or about July 14, 2003, an ARL staff member mailed three flyers to Washington, DC promoting an "Eddie Kahn Tax Seminar."

54.     On or about August 20, 2003, a document was emailed to ARL customers and placed on the ARL website announcing the name change from "American Rights Litigators" to

"Guiding Light of God Ministries."

55.    On or about October 7, 2003, when questioned by an ARL customer about an Illegal Financial Activity Alert issued by the U.S. Treasury about Fictitious Debt Elimination Schemes, defendant TRUE answered by email that "I don't see where this Alert affects the bond in our responses."

56.    On or about October 14, 2003, when questioned by another ARL customer about the aforementioned U.S. Treasury Alert, defendant HUNTER answered by email that "ours are effective, we even renamed them to: certified draft."

57.    On or about October 14, 2003, defendant TRUE sent an email to an ARL customer regarding discharging credit card debt with BOEs.

58.    On or about December 23, 2003, defendant TANGUAY sent an email soliciting information regarding a publication called "I Have Challenged the IRS and Won!"

59.    On or about January 6, 2004, defendant HUNTER sent an email to another ARL customer offering to "do the BOE" and soliciting a payment.

60.    On or about January 8, 2004, more than a week after the Preliminary Injunction was entered against ARL, an ARL worker sent an email to a customer announcing that "the paperwork that we prepare for people is valid" and that "we are still available to help folks."

61. On or about January 13, 2004, an ARL worker sent an email to a customer regarding that order, requesting that the customer "please give us a day or two to get some options together for you."

62.    On or about January 15, 2004, defendant TRUE sent an email offering to purchase "BOE paper" from defendant KAHN.

63.     On or about January 26, 2004, defendant WILLIAMSON, when asked by a customer about a letter the customer had received from the IRS warning that ARL was promoting an "abusive tax avoidance transaction," sent an email telling the customer "Not to worry."

64.     On or about January 27, 2004, defendant WILLIAMSON, when asked by a customer if ARL was barred from helping him, sent an email telling the customer, "No!"

65.     On or about January 29, 2004, an ARL worker sent an email to a customer with regard to the operations of ARL explaining that "we are doing things as normal."

66.     On or about January 30, 2004, defendant WILLIAMSON sent a letter to a customer for that customer to forward to the IRS.

67.     On or about February 6, 2004, defendant KAHN sent an email to defendant TANGUAY regarding bankruptcy and the assets of Guiding Light of God Ministries.

68.     On or about February 6, 2004, an ARL staff member prepared a letter to the IRS for a customer that purported to refute a warning letter the customer had received from the IRS about ARL's "abusive" practices.

69.     On or about February 9, 2004, ARL accepted payment of $400 for enrolling a new customer.

70.     On or about February 12, 2004, an ARL worker prepared a letter to a customer soliciting a payment for a response to IRS correspondence.

**(Conspiracy and Aiding and Abetting and Causing an Act to be Done in violation of Title 18, United States Code, Sections 371 and 2)**

15

## COUNTS 2 THROUGH 12 – MAIL FRAUD

1.      Paragraphs 1 through 10 and 12 through 23 of Count One of this Indictment are realleged and incorporated by reference into Counts 2 through 12 as if set out in full herein.

2.      In addition to the reallegations at paragraph 1, it was further part of the scheme that defendants and co-schemers also caused the manufacture, use, and sale of BOEs and document packages for purported payments to the Tax Division at the United States Department of Justice (hereinafter, "U.S.D.O.J. Tax Division,") to state taxing authorities, and to other creditors.

3.      From in or about 2001, and continuing through in or about September of 2004, in the District of Columbia, and elsewhere, defendants

EDDIE RAY KAHN,
STEPHEN C. HUNTER,
DANNY TRUE,
JERRY R. WILLIAMSON, and
ALLAN J. TANGUAY

and co-schemers, aiding and abetting one another, did knowingly and willfully devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and to exchange, give away, distribute, supply, furnish and procure for unlawful use, any counterfeit or spurious obligation, security, or other article.

4.      On or about the dates enumerated as to each of the Counts herein, in the District of Columbia and elsewhere, for the purpose of executing and attempting to execute said scheme and artifice to defraud, and to obtain money and property by means of materially false and

16

3511674 1

fraudulent pretenses, representations and promises, and to exchange, give away, distribute,

supply, furnish, and procure for unlawful use, any counterfeit or spurious obligation, security, or

other article, defendants

EDDIE RAY KAHN,
STEPHEN C. HUNTER,
DANNY TRUE,
JERRY R. WILLIAMSON, and
ALLAN J. TANGUAY

and co-schemers placed and caused to be placed in a post office and authorized depository for

mail matter, to be sent and delivered by the United States Postal Service, and deposited and

caused to be deposited for delivery by a private or commercial interstate carrier, from or to the

District of Columbia, as set forth in the table below, each instance being a separate Count of this

Indictment:

| Count | Defendant | On or About Date | Sent To | Item Sent | False Representation |
|-------|-----------|------------------|---------|-----------|----------------------|
| 2 | WILLIAMSON | 09/05/03 | U.S. Treasury, Washington, DC | BOE signed by defendant WILLIAMSON in the amount of $8,000 and associated documents | Falsely purporting to pay debt to Bureau of Land Management |
| 3 | HUNTER | 09/08/03 | U.S. Treasury, Washington, DC | BOE signed by ARL customer W.H. in Illinois, in the amount of $155,454.68 and associated documents | Falsely purporting to pay federal taxes |
| 4 | TRUE | 09/25/03 | U.S. Treasury, Washington, DC | BOE signed by defendant TRUE, in the amount of $39,035.02 and associated documents | Falsely purporting to pay debt to CitiFinancial Services, Inc. |

17

| 5 | HUNTER | 10/22/03 | U.S.D.O.J. Tax Division, Washington, DC | BOE signed by ARL customer K.M. in Massachusetts, in the amount of $6,441.74 and associated documents | Falsely purporting to pay court costs |
|---|---|---|---|---|---|
| 6 | KAHN | 10/01/03 | U.S.D.O.J. Tax Division, Washington, DC | BOE signed by defendant KAHN, in the amount of $56,622.86 and associated documents | Falsely purporting to pay federal taxes |
| 7 | TRUE | 10/15/03 | U.S. Treasury, Washington, DC | BOE signed by ARL customer B.G. in Michigan, in the amount of $2,128.28 and associated documents | Falsely purporting to pay federal taxes |
| 8 | TRUE | 10/16/03 | U.S. Treasury, Washington, DC | BOE signed by ARL customer C.S. in Washington, DC, in the amount of $1,000,000 and associated documents | Falsely purporting to draw on non-existent Treasury account |
| 9 | WILLIAMSON | 10/28/03 | U.S. Treasury, Washington, DC | BOE signed by ARL customer S.R. in Florida, in the amount of $408,876.15 | Falsely purporting to pay federal taxes |
| 10 | TANGUAY | 11/04/03 | U.S. Treasury, Washington, DC | "Draft" signed by defendant TANGUAY in the amount of $93,007.04 and associated documents | Falsely purporting to pay federal taxes |
| 11 | HUNTER | 11/20/03 | U.S. Treasury, Washington, DC | BOE signed by defendant HUNTER in the amount of $15,110 and associated documents | Falsely purporting to pay federal taxes |

3511674 1

| 12 | TRUE | 09/13/04 | U.S. Treasury, Washington, DC | BOE signed by defendant TRUE in the amount of $196,000 and associated documents | Falsely purporting to pay federal taxes |
|----|------|----------|-------------------------------|----------------------------------------------------------------------------------|------------------------------------------|

**(Mail Fraud, Aiding and Abetting, Causing an Act to be Done, in violation of Title 18, United States Code, Sections 1341 and 2.)**

A TRUE BILL

FOREPERSON

NATHAN J. HOCHMAN
Assistant Attorney General
Tax Division
United States Department of Justice

3511674 1